# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| KELLY MCCLANAHAN | * | |
| 1200 South Courthouse Road, Unit 124 | * | |
| Arlington, VA  22204, | * | |
| | * | |
| and | * | |
| | * | |
| CORI CRIDER | * | |
| Flat 2, 59 Monkton Street | * | |
| London SE11 4TX | * | |
| United Kingdom, | * | |
| | * | Civil Action No. 1:14-cv-00483 |
| Plaintiffs, | * | |
| | * | |
| v. | * | |
| | * | |
| DEPARTMENT OF JUSTICE | * | |
| 950 Pennsylvania Avenue, NW | * | |
| Washington, DC  20530, | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## COMPLAINT

Plaintiffs Kelly McClanahan and Cori Crider bring this action against Defendant

Department of Justice pursuant to the Freedom of Information Act, 5 U.S.C. § 552, *et seq.*, *as*

*amended* ("FOIA"), the Privacy Act, 5 U.S.C. § 552a, *et seq.* (collectively "FOIA/PA"), the

Federal Declaratory Judgment Act, 28 U.S.C. § 2201, and the All Writs Act, 28 U.S.C. § 1651.

## JURISDICTION

1.      This Court has both subject matter jurisdiction over this action and personal

jurisdiction over Defendant pursuant to 5 U.S.C. § 552(a)(4)(B), 552a(g)(1)(D) and 28 U.S.C. §

1331.

## VENUE

2.      Venue is appropriate under 5 U.S.C. §§ 552(a)(4)(B), 552a(g)(5)  and 28 U.S.C. § 1391.

## PARTIES

3.      Plaintiff Kelly McClanahan ("McClanahan") is a U.S. citizen and is a resident of the Commonwealth of Virginia.  He is the Executive Director and lead attorney of National Security Counselors ("NSC"), a non-profit public interest law firm incorporated in the Commonwealth of Virginia.

4.      Plaintiff Cori Crider ("Crider") is a U.S. citizen and is a resident of the United Kingdom.  She is the Legal Director of the Secret Prisons Team at Reprieve, a human rights law firm in the United Kingdom.

5.      Defendant Department of Justice ("DOJ") is an agency within the meaning of 5 U.S.C. § 552(e), and is in possession and/or control of the records requested by Plaintiffs which are the subject of this action.

6.      The Criminal Division, Federal Bureau of Investigation ("FBI"), Justice Management Division ("JMD"), and Office of Information Policy ("OIP") are DOJ components.

## BACKGROUND

### *PART I: NSC v. CIA*

7.      On 13 May 2010, NSC submitted to the Central Intelligence Agency ("CIA") a FOIA request for copies of all Tables of Contents ('TOCs") for the in-house journal *Studies in Intelligence* ("*Studies*").

8.      On 25 June 2010, the CIA acknowledged receipt of this request and assigned it Request No. F-2010-01186.

9.      On 28 February 2011, having received no further response from the CIA, NSC filed the lawsuit *NSC v. CIA*, No. 11-443 (D.D.C.).  The third count of that lawsuit pertained to Request No. F-2010-01186.

10.     On 5 December 2011, the CIA released redacted copies of the TOCs to NSC. NSC posted them on its website and advertised the posting, inviting academics and journalists to use them as a research tool.

11.     On 13 December 2011, a third party (referred to herein as "Doe") emailed McClanahan, stating that he had been filing FOIA requests for *Studies* articles and TOCs for a long time.  Doe expressed an interest in comparing notes with McClanahan because he had identified numerous items that were released to NSC that weren't released to him, and vice versa.

12.     Doe subsequently informed McClanahan that he possessed a previously published list of old *Studies* articles that NSC could use in its litigation.  After some discussion, Doe faxed McClanahan part of one cumulative index of articles from 1957-79, which was originally published in a special issue in 1979, and another index of articles from 1980-82, which was originally published in the Winter 1982 issue.

13.     While reviewing the indices provided by Doe (referred to herein as "the indices"), McClanahan noticed that they included a significant amount of information that CIA had redacted from the TOCs.  McClanahan then began to suspect that the indices may include classified information, due to the lack of any redactions.  When McClanahan asked Doe about the lack of redactions, Doe explained that he was given the indices by another party and did not receive them through FOIA.

14.     The Government is allowed to revoke or deny security clearances based on several criteria, one of which involves the improper handling of classified information.

15.     Because McClanahan has held a government security clearance in the past and reasonably foresaw the need to hold one again in the future, he approached his Government counterpart Ryan Parker ("Parker") for guidance on how to address the possibility that he was in possession of classified information.

16.     Parker advised McClanahan that he "sent the information [McClanahan] emailed [him] to the CIA."

17.     In January 2012, FBI Special Agent Melinda Belvin ("Belvin") called McClanahan and asked him to come to the Washington Field Office ("WFO") and meet with her to discuss the potentially classified records.

18.     On 18 January 2012 McClanahan met with Belvin at the WFO.

19.     At the beginning of this meeting McClanahan signed a standard Non-Disclosure Agreement ("NDA") at Belvin's insistence.

20.     McClanahan explained to Belvin how he had come to possess the indices and why he suspected that they might contain classified information.  He did not withhold any information from her, including Doe's true identity.

21.     During this meeting Belvin asked McClanahan many seemingly tangential questions, such as what his email address was, what Internet Service Provider ("ISP") he used, and where it was located.  McClanahan answered all of Belvin's questions truthfully.

22.     At the end of the meeting McClanahan gave Belvin the printed copies he had made of the indices at her request and informed her that he expected to receive redacted copies

back, with any classified information redacted.  Belvin responded that the Government would review the records for classified information and get back to McClanahan.

23.     The parties agreed that McClanahan would keep electronic copies of the indices until the matter was resolved.

24.     After a month had passed, McClanahan emailed Belvin to ask how much longer the classification review would take.  Belvin replied that she did not know, adding, "Nonetheless, this matter is under investigation.  Please continue to secure the information until given further direction."

25.     On 26 June 2012, McClanahan met again with Belvin at the WFO to discuss the indices and the *Mobley* document discussed in Part II below.

26.     At the beginning of this meeting McClanahan signed another standard NDA at Belvin's insistence.

27.     In this meeting Belvin informed McClanahan that the indices contained an unspecified amount of classified information and that the Government would not give him redacted copies.

28.     Belvin pressed McClanahan to give the FBI his computer so it could securely remove the classified information, but McClanahan refused, stating that he would only allow the FBI to delete the information once he received the redacted copies.  Belvin expressed frustration that McClanahan was being uncooperative, and McClanahan informed her that if the FBI wished to gain access to his computer without agreeing to his terms, it could apply for a warrant, which he would move to quash.  Belvin responded that the FBI would do so.

29.     Belvin ultimately agreed to discuss the matter of the redacted copies with the
CIA.  Belvin and McClanahan spent the remainder of the meeting discussing the *Mobley*
document discussed in Part II below.

30.     On 5 July 2012, McClanahan emailed Belvin with questions about the NDAs he
had signed.  She responded, "Please refer your questions and any future correspondence
concerning your FIOA [sic] litigation to FBI Headquarters FIOA [sic] Division Attorney Alina
Semo or WFO Chief Division Counsel Marciann Grzadzinski."  McClanahan then directed his
questions to Semo and Grzadzinski.

31.     Having received no response to his 5 July 2012 emails, McClanahan again
emailed Semo and Grzadzinski on 9 July 2012 and asked, "[P]lease inform me if the CIA the
CIA has decided to accede to my request and provide me with a copy of the allegedly classified
CIA record with the classified information redacted. . . . Ms. Belvin was supposed to consult
with the CIA on this matter and get back to me, but has not."

32.     Semo responded, "I have been advised that your appropriate points of contact for
these matters are DOJ counsel.  As a result, please refer all inquiries regarding . . . [*NSC v. CIA*]
to . . . Ryan Parker . . . ."

33.     When McClanahan followed up with Parker, Parker refused to discuss the matter
(a position he had consistently taken from the beginning).  Parker stated, "I cannot and will not
respond to questions about issues—like the FBI investigation—that are outside of the case."

34.     McClanahan then emailed Semo again, "Ms. Semo, as you can see, Mr. Parker is
not willing to act as the point of contact for the FBI regarding the classified CIA document that
Melinda Belvin was investigating.  Please either resolve this with Mr. Parker or provide me with
an alternate POC."

35.     Semo replied, "To the extent that your inquiry seeks information related to the underlying FBI investigation of the classified CIA document, it is not appropriate for you to contact anyone regarding that investigation.  The FBI will conduct the logical investigation and will come to a logical conclusion based on what it determines during the course of its investigation.  The FBI only communicates with subjects/witnesses/victims when it is warranted—the FBI does not otherwise provide updates as to its investigations."

36.     On 28 July 2012, McClanahan sent the following email to Semo, copying Parker:

I think you have misunderstood the problem.  The investigation regarding the CIA document is over, at least that's what Melinda told me.  The only question at this point is whether the CIA will give me a redacted copy of the document, with the classified information redacted.  At our last meeting she said she would have to check with the CIA and get back with me.  Then she didn't get back to me.  Then, when I asked her for an update, she instructed me to talk to you.  Then you instructed me to talk to Ryan Parker.  Then Ryan informed me that he wouldn't talk to me.  Which brings us back to you.

To avoid any further confusion, I'll make this very simple:

1) I voluntarily gave the FBI a CIA document that I thought might be classified.
2) The FBI informed me that the CIA had determined that the document did in fact contain classified information.
3) I asked for a copy of the document with the classified information redacted.
4) The FBI refused to give me a redacted copy, saying that it could not make such a decision for the CIA.
5) The FBI then said it would check with the CIA to see if I could be given a redacted copy.
6) Will the government give me the redacted copy I want or not?

If the answer is yes, please tell me when I can expect to receive it.  If the answer is no, then I will take any other measures legally available to me to promptly obtain a properly redacted copy, up to and including filing a motion with the Court.  If you do not answer by the close of business Wednesday 8/1/12, then I will take any other measures legally available to me to promptly obtain a properly redacted copy, up to and including filing a Motion with the Court.

Neither Semo nor Parker replied to this email, and Semo never contacted McClanahan again.

37.     On 3 August 2012, McClanahan filed a motion in *NSC v. CIA* asking the Court to order the CIA to give him the redacted indices.

38.     Over the CIA's objection, the Court ordered it on 15 August 2012 to give copies of the indices to McClanahan with all classified information redacted.

39.     On 3 September 2012, Parker sent McClanahan redacted copies of the indices.

40.     On 31 October 2012, McClanahan filed NSC's opposition brief to the CIA's Motion for Summary Judgment (filed Aug. 8, 2012).  Because this brief and some of its exhibits contained a small amount of information that the CIA claimed was classified, McClanahan filed the brief and relevant exhibits *in camera* so that he could not be accused later of mishandling classified information.

41.     On 22 December 2012, McClanahan filed a motion asking the Court to place his 31 October 2012 filings on the public record with minimal redactions.  The Court granted this motion on 15 February 2013.

42.     On 21 February 2013, after a meeting discussed in greater detail in Part III below, McClanahan met with Belvin at the WFO and deleted the classified indices from his computer.

### *PART II: MOBLEY v. DOD*

43.     On 26 January 2010, Sharif Mobley ("Mobley"), a U.S. citizen living in Yemen with his family, was seized by Yemeni security officials and shot in the process.  He was taken to the Police Hospital, then transferred to prison, then transferred to the General Hospital.  The Yemeni government claims that it has no records about him prior to 7 March 2010.

44.     According to FBI records, FBI agents interrogated Mobley numerous times between 30 January 2010 and 7 April 2010 while he was in Yemeni government custody.

45.     On 7 March 2010, Mobley allegedly attempted to escape the General Hospital. During the incident, a guard was shot, who later died.

46.     After this incident, Mobley was transferred back to prison and charged with murder.  Records about this charge are the first records about Mobley the Yemeni government admits to having.

47.     On 25 March 2010, Mobley's wife Nzinga Islam hired Crider to defend her husband and secure his release from prison.

48.     On 22 July 2010, Crider filed FOIA/PA requests with the FBI and several other agencies for records about Mobley.

49.     On 3 August 2010, the FBI acknowledged receipt of the request directed to it and assigned it Request No. 1151632.

50.     On 11 May 2011, Crider hired McClanahan to manage the Mobley FOIA/PA requests and, if necessary, litigate them.

51.     On 17 October 2011, having received no records from the FBI, McClanahan filed the lawsuit *Mobley v. DOD*, No. 11-2073 (D.D.C.), and two other related cases.  The third count of *Mobley v. DOD* pertained to Request No. 1151632.

52.     On 4 May 2012, the FBI released several redacted records to McClanahan.  Many of the redactions were made pursuant to FOIA Exemption (b)(1), which pertains to classified information.  McClanahan immediately sent the records to Crider.

53.     One of the released records was an FD-302 Interview Report dated 7 April 2010 (referred to herein as "the 302 form") which bore classification markings stating that it was classified on 1 May 2012, four days before it was released.

54.    A murder trial in Yemen involves three parties: the State, the Defendant, and the family of the deceased.

55.    On 23 May 2012, the lawyer for the deceased guard's family filed an unredacted copy of the 302 form—which bore no classification markings at all—with the court in Mobley's criminal trial.  The lawyer claimed that the Yemeni government gave it to him after the FBI gave it to them.  Pursuant to court rules, copies of the unredacted 302 form were also given to Crider and the rest of Mobley's legal team.

56.    While reviewing the released records, Crider discovered that the FBI had redacted information from the 302 form it released through FOIA/PA even though it gave an unredacted copy to the Yemeni government.  Accordingly, she emailed her unredacted copy of the 302 form to McClanahan on 31 May 2012 to use as evidence in the FOIA/PA case.

57.    On 4 June 2012, McClanahan filed a motion in one of the related *Mobley* cases— *Mobley v. CIA*, No. 11-2072 (D.D.C.)—asking the Court to establish a procedure through which he could file information that he believed to be classified (which later turned out not to be) with the Court.  In a subsequent declaration supporting this motion, McClanahan wrote, "I believe that such a solution would also prove useful in the related case *Mobley v. DOD*, No. 11-2073 (D.D.C.).  In that case I intend to offer into evidence an unredacted copy of an FBI document that the FBI claims contains classified information.  I obtained the unredacted copy because the FBI provided it to the Yemeni government, which provided it to a private party involved with Mr. Mobley's criminal case, who filed it on the record in that case, thereby providing a copy to Mr. Mobley's counsel, who provided it to me."  This was the first time that McClanahan mentioned to anyone in the Government that he possessed an unredacted copy of the 302 form.

58.     On 25 June 2012, Belvin called McClanahan and asked him to come to the WFO for another meeting (the 26 June 2012 meeting described in Part I above).  She stated that she wanted to discuss both the 302 form and the indices.  This was the first communication from the Government McClanahan received regarding the 302 form.

59.     On 26 June 2012, after discussing the indices, Belvin and McClanahan discussed the 302 form.  McClanahan explained to Belvin how he had come to possess the form.

60.     During this meeting Belvin asked McClanahan many seemingly tangential questions, such as what Crider's email address was and what ISP Reprieve used.  McClanahan answered all of Belvin's questions truthfully to the best of his knowledge.

61.     Belvin again pressed McClanahan to give the FBI his computer so it could securely remove the classified information, but McClanahan again refused.

62.     Belvin ultimately stated that the FBI would review the unredacted 302 form for classified information and get back to McClanahan.  She stated that she would contact the DOJ lawyer handling the case—Judson Littleton ("Littleton")—soon and discuss the matter with him.

63.     On 6 July 2012, Littleton emailed McClanahan and stated, "I have been advised that FBI has completed its classification review, and all information that was redacted under (b)(1) in the version of the document you obtained under FOIA has been determined and reaffirmed to be currently and properly classified."

64.     On 12 October 2012, the FBI filed a sworn declaration from a senior FOIA official—Dennis Argall ("Argall")—which stated, "Contrary to Plaintiff's allegation, the FBI has no evidence indicating that the document was provided by the FBI to the Yemeni Government as alleged by Plaintiff."

11

65.     On 21 February 2013, after a meeting discussed in greater detail in Part III below, McClanahan met with Belvin at the WFO and deleted the unredacted 302 form from his computer.

### PART III: THE 5 NOVEMBER 2012 AND 8 FEBRUARY 2013 MEETINGS

66.     On 29 October 2012, McClanahan emailed Parker stating that, since he would soon have no further need for any of the classified information he possessed, he was now ready to allow the FBI to delete it, "as long as they guarantee that it will not corrupt my system."  (This caveat referred to a statement made by Belvin in the first meeting with McClanahan, in which she expressed the FBI's preference for securely extracting the data directly from a computer's hard drive instead of simply deleting it.)  In this email McClanahan also stated that he would not allow the FBI to completely erase his entire hard drive—another solution Belvin had stated the FBI favored.

67.     On 5 November 2012, Belvin and her partner visited McClanahan's home unannounced, saying, "We heard that you were willing to cooperate again."  In the meeting that followed, Belvin asked McClanahan to allow the FBI to search his office "to see if [he had] any other classified material."  McClanahan refused, stating that the records that the FBI would want to search were covered by attorney-client privilege, but attesting that none of them were classified.

68.     Belvin then asked McClanahan to give the FBI his computer so that they could extract the classified material.  McClanahan reiterated that he was willing to do so only after he had spoken with an FBI technician to make sure that the process would not corrupt the rest of his data.

69.     McClanahan then added that he was unwilling to let the computer out of his sight in the FBI's possession, given that Belvin had already expressed a desire to go hunting through his privileged records for "any other classified material."  Belvin replied that the work would have to be done in a Sensitive Compartmented Information Facility ("SCIF") that McClanahan could not enter.  As he had in June 2012, McClanahan informed Belvin that if the FBI wished to gain access to his computer without agreeing to his terms, it could apply for a warrant, which he would move to quash.  Belvin again responded that the FBI would do so if McClanahan did not cooperate.  The meeting ended without a resolution.

70.     On 30 January 2013, Belvin asked McClanahan to come to the WFO for a meeting with a prosecutor who "wanted to talk to him attorney to attorney."

71.     Concerned that the involvement of a prosecutor (as opposed to a civil litigator) signaled that the Government was considering criminal prosecution of him because he refused to allow the FBI unsupervised access to his computer and files, McClanahan secured legal representation for the meeting.

72.     On 8 February 2013, McClanahan and his counsel met at the WFO with Belvin, her partner, two prosecutors from the United States Attorney's Office for the Eastern District of Virginia (where any prosecution of McClanahan would have to be brought), and a lawyer from the DOJ National Security Division.

73.     In this meeting, the DOJ lawyers informed McClanahan, "Neither you nor NSC are the subject of any investigation."

74.     This meeting ended with an agreement that McClanahan would bring his computer to the WFO and delete the classified files under the supervision of Belvin and an FBI technician.

75.    As described above, McClanahan did so on 21 February 2013.

### PART IV: EVIDENCE OF ELECTRONIC SURVEILLANCE

76.    NSC's domain nationalsecuritylaw.org, including its website and email accounts, is hosted and maintained by Doteasy, an ISP based in Vancouver, BC.  This domain was established on 31 July 2009, shortly before NSC was officially chartered.

77.    On 25 January 2011, NSC reconfigured its Doteasy email server to keep copies of all received email messages for all accounts on the server.

78.    On or around 28 October 2012, near the end of the arguments with the FBI described above but immediately before the 5 November 2012 meeting, all of the email messages for the shared intern@nationalsecuritylaw.org email account inexplicably disappeared from the Doteasy server.  McClanahan discovered the disappearance on 5 November 2012 when, while helping a new intern set up access to the account, he could not find any messages created before 28 October 2012.

79.    On 5 November 2012, McClanahan opened a trouble ticket with Doteasy technical support regarding the missing intern@nationalsecuritylaw.org email messages.

80.    On 6 November 2012, Doteasy technical support informed McClanahan that they could not explain the missing email messages.

81.    During the same time period, on 4 November 2012, McClanahan began experiencing long unexplained delays when he attempted to download email messages from two NSC email accounts to his computer.

82.    Also on 5 November 2012, McClanahan opened a second trouble ticket with Doteasy technical support about the email delays.

83.     The next day, the email delays disappeared, but Doteasy technical support informed McClanahan that they did not do anything.

84.     Because these unexplained technical problems occurred in such close temporal proximity to the 5 November 2012 meeting and, in the case of the delays, just as inexplicably vanished the next day, McClanahan began to suspect that the FBI had obtained his email messages from Doteasy by utilizing an archaic and legally questionable provision in the Electronic Communications Privacy Act ("ECPA") which allowed the FBI to obtain email messages from an ISP with nothing more than an administrative subpoena if they have been on the server for more than 180 days.  This hypothesis—supported by statements endorsing the practice in DOJ manuals—potentially explained two previously puzzling facts: (1) Belvin had persisted in previous meetings in asking for details about NSC's and Reprieve's respective ISPs, even though that information had no apparent relevance to the investigations; and (2) Belvin had twice left McClanahan—most recently just a few days earlier—with the impression that she believed that it was a foregone conclusion that the FBI would obtain access to his records, and yet he had still not seen a warrant.

85.     Accordingly, on 16 November 2012, McClanahan informed Doteasy that he had reason to believe that the FBI would soon be trying to obtain NSC's email messages if it had not done so already and instructed Doteasy not to release any data to the FBI without informing him and without a judicial warrant.  Doteasy refused to discuss the matter and simply responded, "If the FBI or any other Law Enforcement Agency does contact us for information, we do require them to provide a subpoena or warrant specifically for the information they require."  Doteasy refused to allow McClanahan to speak to a member of its legal department, and when he

formally asked on 30 November 2013 if Doteasy had received any requests for NSC records, Doteasy ceased responding to him altogether.

86.     While all of the evidence cited in this Part is admittedly circumstantial, it does give both McClanahan and Crider definite reason to believe that the FBI may have quietly obtained their privileged email traffic and possibly even issued gag orders to their respective ISPs to cover its tracks.  Both McClanahan and Crider would like to believe that this confluence of events is purely coincidental, but they have no evidence to support such a belief.

87.     Accordingly, McClanahan and Crider filed a series of FOIA/PA requests with FBI and JMD for records which could either prove or assuage their concerns.

## **FIRST CAUSE OF ACTION**

## **(MCCLANAHAN – FBI – RECORDS DENIAL – 1203387-000, 1203387-001)**

88.     Plaintiffs repeat and reallege the allegations contained in all paragraphs set forth above.

89.     On 16 November 2012, McClanahan submitted to the FBI a FOIA/PA request.  In this request he explained that the FBI had conducted one or more investigations pertaining to him and/or NSC involving his possession of classified information in the context of two federal court cases.  The request specifically stated:

> This is a request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, *et seq.*, and the Privacy Act, 5 U.S.C. § 552a, *et seq.*, for copies of **the following categories of FBI records created since 1 January 2012:**
>
> > 1.     **Any and all records, including cross-references, in the Central Records System ("CRS") or Electronic Surveillance index ("ELSUR") pertaining to me, National Security Counselors, any case numbers assigned to the above investigations, or any of the classified information I possessed;**

2.      Any and all records in any shared drives, internal servers, or personal computers in FBI Headquarters, the Washington Field Office, or any FBI components in Yemen pertaining to me, National Security Counselors, any case numbers assigned to the above investigations, or any of the classified information I possessed;

3.      Any and all emails in the FBI email system(s) or personal email folders on personal computers used by FBI Headquarters, the Washington Field Office, or any FBI components located in Yemen including in the body of the email:

    a.      Any permutations of my name or National Security Counselors;

    b.      Any case numbers assigned to the above investigations; or

    c.      Any mention of the classified information I possessed;

4.      Any and all records pertaining to subpoenas or warrants requested or obtained by the FBI regarding me, National Security Counselors, any case numbers assigned to the above investigations, or any of the classified information I possessed;

5.      Any and all records created or maintained by any of the following branches or offices pertaining to me, National Security Counselors, any case numbers assigned to the above investigations, or any of the classified information I possessed:

    a.      National Security Branch;

    b.      Criminal, Cyber, Response, and Services Branch;

    c.      Information Technology Branch;

    d.      Office of the General Counsel;

    e.      Office of Integrity and Compliance;

    f.      Records Management Division; and

    g.      Security Division;

6.      **Any and all correspondence (including email correspondence) to or from Special Agent Melinda Belvin pertaining to me, National Security Counselors, any case numbers assigned to the above investigations, or any of the classified information I possessed; and**

7.      **Any and all records identified or referenced in records responsive to Items 1-6 above which are not otherwise independently responsive to those Items.**

90.      On 23 November 2012, the FBI acknowledged receipt of this request and assigned it Request No. 1203387-000.

91.      On 17 January 2013, the FBI informed McClanahan: "The material you requested is located in an investigative file which is exempt from disclosure pursuant to 5 U.S.C. § 552(b)(7)(A). . . . The records responsive to your request are law enforcement records; there is a pending or prospective law enforcement proceeding relevant to these responsive records, and release of the information contained in these records could reasonably be expected to interfere with enforcement proceedings."

92.      On 22 January 2013, McClanahan appealed the FBI's response to OIP.  OIP acknowledged this appeal on 31 January 2013 and assigned it Appeal No. AP-2013-01698.

93.      On 23 April 2013, OIP affirmed FBI's determination.  OIP's letter only contained a recitation of the statutory definition for FOIA Exemption (b)(7)(A) and a conclusory statement that the requested records met the definition.

94.      On 10 October 2013, McClanahan submitted to the FBI a FOIA/PA request virtually identical to Request No. 1203387-000.  The only new information in this request was an acknowledgement that the request was being resubmitted since almost a year had passed since the last request and the language: "I was informed by attorneys from the National Security Division and the U.S. Attorney's Office for the Eastern District of Virginia on 8 February 2013

18

that neither I nor NSC was 'the target' of any ongoing criminal or national security investigations, but I still believe that information about NSC or myself resides in records about closed or ongoing investigations about *others*."

95.     On 28 October 2012, the FBI acknowledged receipt of this request and assigned it Request No. 1203387-001.

96.     On 11 December 2013, the FBI again denied McClanahan's request.  The denial letter was identical to the 17 January 2013 with the exception of the Request Number.

97.     On 8 February 2014, McClanahan again appealed the FBI's response to OIP.

98.     OIP has not responded to McClanahan's appeal as of this writing.

99.     As twenty working days have elapsed without a substantive determination by OIP, McClanahan has exhausted all required administrative remedies.

100.    McClanahan has a legal right under FOIA/PA to obtain the information he seeks, and there is no legal basis for the denial by the FBI of said right.

## SECOND CAUSE OF ACTION

## (CRIDER – FBI – CONSTRUCTIVE RECORDS DENIAL – 1209810-000)

101.    Plaintiffs repeat and reallege the allegations contained in all paragraphs set forth above.

102.    On 25 February 2013, Crider, through counsel, submitted to the FBI a FOIA/PA request for all records about her.  The request specifically stated:

This includes, *but is not limited to*:

1.       **Any and all records, *including cross-references*, in the Central Records System ("CRS") or Electronic Surveillance index ("ELSUR") pertaining to Ms. Crider;**

2.      Any and all records in any shared drives, internal servers, or personal computers in FBI Headquarters, the Washington Field Office, or any FBI components in Yemen or the United Kingdom pertaining to Ms. Crider;

3.      Any and all emails created since 1 January 2012 in the FBI email system(s) or personal email folders on personal computers used by FBI Headquarters, the Washington Field Office, or any FBI components located in Yemen or the United Kingdom including Ms. Crider's name or identifying information in the subject or body of the email;

4.      Any and all records created or maintained by any of the following branches or offices pertaining to Ms. Crider:

   a.      National Security Branch;

   b.      Criminal, Cyber, Response, and Services Branch;

   c.      Information Technology Branch;

   d.      Office of the General Counsel;

   e.      Office of Integrity and Compliance;

   f.      Records Management Division; and

   g.      Security Division; and

5.      Any and all records identified or referenced in records responsive to Items 1-4 above which are not otherwise independently responsive to those Items.

103.    On 13 March 2013, the FBI acknowledged receipt of this request and assigned it Request No. 1209810-000.

104.    Even though the FBI's "Check Status of Your FOIA Request" function on its website states that this request was closed, Crider has received no response from the FBI as of this writing.

105.    As twenty working days have elapsed without a substantive determination by the FBI, McClanahan has exhausted all required administrative remedies.

106.   Crider has a legal right under FOIA/PA to obtain the information she seeks, and there is no legal basis for the denial by the FBI of said right.

## THIRD CAUSE OF ACTION

### (MCCLANAHAN – JMD – CONSTRUCTIVE RECORDS DENIAL – 2791986)

107.   Plaintiffs repeat and reallege the allegations contained in all paragraphs set forth above.

108.   On 18 February 2014, McClanahan submitted to JMD a FOIA/PA request for all records about him in the Justice Security Tracking and Adjudication Record System ("JSTARS").  JSTARS is the DOJ repository for information about security clearances held by DOJ.  If the FBI had collected information about McClanahan which could affect a future security clearance adjudication, it would likely be stored in JSTARS.

109.   On 6 March 2014, JMD acknowledged receipt of this request and assigned it Request No. 2791986.

110.   McClanahan has received no further response from JMD as of this writing.

111.   As twenty working days have elapsed without a substantive determination by JMD, McClanahan has exhausted all required administrative remedies.

112.   McClanahan has a legal right under FOIA/PA to obtain the information he seeks, and there is no legal basis for the denial by JMD of said right.

## FOURTH CAUSE OF ACTION

### (CRIDER – JMD – CONSTRUCTIVE RECORDS DENIAL – 2791609)

113.   Plaintiffs repeat and reallege the allegations contained in all paragraphs set forth above.

114.     On 18 February 2014, Crider, through counsel, submitted to JMD a FOIA/PA request for all records about her in JSTARS.  Since Crider currently has a security clearance sponsored by DOJ, if the FBI had collected information about her which could affect her security clearance, it would likely be stored in JSTARS.

115.     On 6 March 2014, JMD acknowledged receipt of this request and assigned it Request No. 2791609.

116.     Crider has received no further response from JMD as of this writing.

117.     As twenty working days have elapsed without a substantive determination by JMD, Crider has exhausted all required administrative remedies.

118.     Crider has a legal right under FOIA/PA to obtain the information she seeks, and there is no legal basis for the denial by JMD of said right.

## FIFTH CAUSE OF ACTION

## (MCCLANAHAN – CRIMINAL/OIP – CONSTRUCTIVE RECORDS DENIAL – CRM-201400067P)

119.     Plaintiffs repeat and reallege the allegations contained in all paragraphs set forth above.

120.     On 23 September 2013, McClanahan submitted to the DOJ Criminal Division a FOIA/PA request for "all Special Crimes Reports or routine disseminations of crimes information made pursuant to the Memorandum of Understanding on Reporting of Information Concerning Federal Crimes about [him]."  The requested records constitute two of the general mechanisms by which intelligence agencies provide evidence of crimes to DOJ.  If the CIA or National Security Agency was involved in any investigation involving McClanahan or NSC, records of that involvement would likely be located in these records.

22

121.    On 22 November 2013, the Criminal Division acknowledged receipt of this request and assigned it Request No. CRM-201400067P.  The Criminal Division stated that the responsive records would be located in another DOJ component and that it had referred the request to OIP.

122.    McClanahan has received no response from OIP as of this writing.

123.    As twenty working days have elapsed without a substantive determination by OIP, McClanahan has exhausted all required administrative remedies.

124.    McClanahan has a legal right under FOIA/PA to obtain the information he seeks, and there is no legal basis for the denial by OIP of said right.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Kelly McClanahan and Cori Crider pray that this Court:

(1)    Order the Federal Bureau of Investigation, Justice Management Division, and Office of Information Policy to release all requested records to Plaintiffs;

(2)    Order preliminary and permanent injunctive and/or declaratory relief as may be appropriate;

(3)    Award reasonable costs and attorneys' fees as provided in 5 U.S.C. § 552(a)(4)(E), 28 U.S.C. § 2412(d), or any other applicable law;

(4)    Expedite this action in every way pursuant to 28 U.S.C. § 1657(a); and

(5)    Grant such other relief as the Court may deem just and proper.

Date:   March 21, 2014

Respectfully submitted,


/s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
1200 South Courthouse Road
Suite 124
Arlington, VA  22204
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiffs*