## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

KELLY MCCLANAHAN, *et al.*,

                Plaintiffs,

                v.

U.S. DEPARTMENT OF JUSTICE,

                Defendant.

Civil Action No. 14-483 (BAH)

Chief Judge Beryl A. Howell

## MEMORANDUM OPINION

The plaintiffs, Kelly McClanahan and Cori Crider, brought this lawsuit asserting five claims under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the Privacy Act ("PA"), 5 U.S.C. § 552a, against the Department of Justice ("DOJ"), regarding the manner and sufficiency with which DOJ and its components responded to six of the plaintiffs' requests for records. *See* Compl. ¶¶ 88–124, ECF No. 1. In response to DOJ's first motion for summary judgment, the plaintiffs voluntary dismissed three claims, *see* Mem. and Order at 1, ECF No. 22, leaving two claims for which DOJ has now renewed its motion for summary judgment, *see* Def.'s Renewed Mot. Summ. J. ("Def.'s Mot."), ECF No. 25. For the reasons set out below, DOJ's renewed motion for summary judgment is granted.

## I.      BACKGROUND

The three FOIA requests at issue in the plaintiffs' two remaining claims sought records from the Federal Bureau of Investigation ("FBI") and arise from the plaintiffs' involvement in two other FOIA cases before this Court. The pertinent facts regarding those two cases are briefly summarized before turning to the events leading to the current lawsuit and the procedural history.

A.      **First FOIA Litigation**

In February 2011, Mr. McClanahan, on behalf of his law firm, National Security Counselors ("NSC"), filed a lawsuit against the Central Intelligence Agency ("CIA"), challenging that agency's response to his FOIA request for "copies of all Tables of Contents ("TOCs") for the in-house journal *Studies in Intelligence* (*"Studies"*)." Compl. ¶¶ 7, 9 (citing *NSC v. CIA*, Civil No. 11-443 (BAH) (the "*NSC* FOIA case")).  Subsequently, in December 2011, "the CIA released redacted copies of the TOCs to NSC," which promptly posted the redacted TOCs online on the NSC's website.  *Id.* ¶ 10.  Soon after this posting, Mr. McClanahan was contacted by a third party, who eventually sent him cumulative indices of articles from *Studies*.  *Id.* ¶¶ 11–12.  Correctly suspecting that the indices contained classified information, which the "CIA had redacted from the TOCs," *id.* ¶ 13, Mr. McClanahan sought guidance from a DOJ attorney, who alerted the CIA, *id.* ¶¶ 15–16.  Thereafter, in January and June 2012, the FBI interviewed Mr. McClanahan twice in the FBI's Washington Field Office regarding his possession of the classified indices.  *Id.* ¶¶ 17–18, 25.

B.      **Second FOIA Litigation**

In May 2011, Mr. McClanahan was hired by Ms. Crider, a human rights attorney based in the United Kingdom, to litigate a FOIA case for records related to an American citizen, Sharif Mobley, who was detained in Yemen for murder.  *Id.* ¶¶ 4, 44–45, 50–51 (citing *Mobley v. Dep't of Def.*, Civil No. 11-2073 (BAH) (the "*Mobley* FOIA case")).  While litigating the parallel murder case in Yemen, Ms. Crider received an unredacted copy of an FBI interview report, dated April 7, 2010, summarizing the FBI interview of Mobley.  *Id.* ¶¶ 53, 55.  Realizing that this report possibly contained classified information, Ms. Crider forwarded the document to Mr. McClanahan "to use as evidence in the FOIA/PA case" in this Court.  *Id.* ¶ 56.  In June 2012, the

FBI met with Mr. McClanahan regarding the unredacted interview report as well as the classified indices of articles from *Studies*. *Id.* ¶ 58.

### C.    The Plaintiffs' FOIA Requests at Issue

Despite conceding the absence of any direct evidence in support of their theory, *id.* ¶ 86, the plaintiffs "believe that the FBI may have quietly obtained their privileged email traffic and possibly even issued gag orders to their respective ISPs to cover its tracks," *id.* In order to "either prove or assuage their concerns," *id.* ¶ 87, the plaintiffs submitted FOIA requests to the FBI and DOJ's Justice Management Division ("JMD"),[1] *id.* The three FOIA requests remaining at issue in this case were submitted in November 2012 and February and October 2013 to the FBI. Specifically, Mr. McClanahan submitted a FOIA/PA request to the FBI on November 16, 2012 ("2012 McClanahan Request"), seeking "[a]ny and all records . . . pertaining to me, National Security Counselors, any case numbers assigned to the above investigations, or any of the classified information I possessed." *Id.* ¶ 89; Def.'s St. of Mat. Facts as to Which There Is No Genuine Dispute ("Def.'s SMF") ¶ 1, ECF No. 25-2.[2] The FBI denied the request because the requested materials were "located in an investigative file which is exempt from disclosure pursuant to 5 U.S.C. § 552(b)(7)(A)." Compl. ¶ 91; Def.'s SMF ¶ 2. The administrative appeal from this denial was affirmed on April 23, 2013. Compl. ¶ 93; Def.'s SMF ¶¶ 3–4.

The second FOIA request at issue was filed by Mr. McClanahan with the FBI on October 10, 2013 ("2013 McClanahan Request"), for the same information requested in the 2012 McClanahan Request as well as any responsive documents created in the past year. Compl. ¶ 94.

---

[1]      The plaintiffs initially challenged DOJ's response to a total of six FOIA requests, but as noted, withdrew their challenges to DOJ's responses to three of the requests set out in Counts Three, Four, and Five of their complaint. *See* Mem. and Order at 1.
[2]      The plaintiffs did not respond concisely to DOJ's "Statement of Material Facts as to Which There Is No Genuine Dispute," ECF No. 25-2, as required by Local Civil Rule 7(h)(1), and, consequently, those uncontroverted "facts identified by the moving party in its statement of material facts are admitted." LCvR 7(h)(1).

This request was likewise denied because the responsive files were located in an investigative file exempt under Exemption 7(A). *Id.* ¶ 96. Mr. McClanahan again appealed this denial decision. *Id.* ¶ 97.

Finally, Ms. Crider submitted a FOIA/PA request with the FBI on February 25, 2013 ("Crider Request"), seeking "[a]ny and all records . . . pertaining to Ms. Crider." *Id.* ¶ 102. Ms. Crider received no response from the FBI other than that her request had been received and assigned a request number. *Id.* ¶¶ 103–04.

### D.    Procedural History

The plaintiffs then filed the instant complaint on March 21, 2014. *See generally* Compl. On October 6, 2014, having determined that the basis for the Exemption 7(A) response had expired, the FBI reversed its denial of the 2012 McClanahan Request and the Crider Request. Def.'s SMF ¶¶ 5, 14; Def.'s First Mot., Ex. 1 ("First Hardy Decl.") ¶ 20, ECF No. 12-1. By November 7, 2014, the FBI had completed the search for responsive documents to both these requests. Def.'s SMF ¶¶ 7–16. For the 2012 McClanahan Request, the FBI processed a total of 339 pages, of which 225 pages were withheld as duplicates, 76 pages were released in full, 14 pages were withheld in part, and 24 pages were withheld in full. *Id.* ¶ 7. For the Crider Request, the FBI processed a total of 281 pages, of which 153 pages were released in full, 101 pages were withheld in part, and 27 pages were withheld in full. *Id.* ¶ 16.

DOJ moved for summary judgment on all five counts of the plaintiffs' Complaint on the grounds that adequate searches had been conducted in response to the plaintiffs' requests, except for the 2013 McClanahan Request, and all reasonably segregable non-exempt information had been released. *See generally* Def.'s Mot. Summ. J. ("Def.'s First Mot."), ECF No. 12. With respect to the 2013 McClanahan Request, DOJ contended that Mr. McClanahan had failed to

exhaust his administrative remedies.  Def.'s Mem. Supp. Def.'s First Mot. at 29–31, ECF No. 12. The plaintiffs conceded that DOJ had "'provided sufficient information . . . to satisfy Plaintiffs that their FOIA/PA requests had been properly processed' as to three of the six requests at issue" in Counts Three, Four, and Five of the Complaint, Mem. and Order at 1 (quoting Pls.' Opp'n to Def.'s First Mot. at 1 n.1, ECF No. 16), but continued to challenge the sufficiency of the agency's response to three FOIA requests—the 2012 and 2013 McClanahan Requests and the Crider Request—referenced in Counts One and Two of the Complaint, *id.* at 2.

Specifically, the plaintiffs argue that Mr. McClanahan exhausted his administrative remedies as to the 2013 McClanahan Request when "he sent his appeal in an email to an address maintained by the defendant specifically for the receipt of appeals to the denial of FOIA requests." *Id.* at 3.  That email address, however, was deactivated on January 17, 2013, less than a month before Mr. McClanahan emailed his appeal.  *Id.*  Noting that the "purpose of the FOIA's administrative exhaustion requirement is to give 'the agency [] an opportunity to exercise its discretion and expertise on the matter and [] make a factual record to support its decision,'" *id.* at 5 (quoting *Wilbur v. CIA*, 355 F.3d 675, 677 (D.C. Cir. 2004) (alterations in original) (internal quotation marks omitted)), and that administrative exhaustion is not a jurisdictional prerequisite but a "prudential consideration," *id.*, the Court remanded Mr. McClanahan's appeal of the FBI's denial of his 2013 Request back to DOJ, *id.* at 5–6.  The Court granted DOJ's motion for summary judgment as to Counts Three, Four, and Five of the Complaint, "since the plaintiff no longer challenge[d] the adequacy of the defendants processing of those claims," and denied the motion as to Counts One and Two to avoid addressing the remaining claims "in a piecemeal fashion" and to "resolve all of the plaintiff's remaining challenges simultaneously," after the "processing of the 2013 [McClanahan] Request." *Id.*

In response to the 2013 McClanahan Request, the FBI processed a total of 69 pages, of which 30 pages were released in full, 13 pages were withheld in part, and 26 pages were withheld in full. Def.'s SMF ¶¶ 11–12. DOJ subsequently renewed its motion for summary judgment as to Count One (challenging the FBI's responses to the 2012 and 2013 McClanahan Requests), and Count Two (challenging the FBI's response to the Crider Request), which motion is now ripe for resolution.

## II.   LEGAL STANDARD

Congress enacted the FOIA as a means "to 'open agency action to the light of public scrutiny,'" *ACLU v. U.S. Dep't of Justice*, 750 F.3d 927, 929 (D.C. Cir. 2014) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976)), and "to promote the 'broad disclosure of Government records' by generally requiring federal agencies to make their records available to the public on request," *DiBacco v. U.S. Army*, 795 F.3d 178, 183 (D.C. Cir. 2015) (quoting *Dep't of Justice v. Julian*, 486 U.S. 1, 8 (1988)). As the Supreme Court has "consistently recognized[,] . . . the basic objective of the Act is disclosure." *Chrysler Corp. v. Brown*, 441 U.S. 281, 290 (1979). At the same time, the statute represents a "balance [of] the public's interest in governmental transparency against 'legitimate governmental and private interests that could be harmed by release of certain types of information.'" *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 559 (D.C. Cir. 2010) ((quoting *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 872 (D.C. Cir. 1992) (en banc) (internal quotation marks omitted)). Reflecting that balance, the FOIA contains nine exemptions set forth in 5 U.S.C. § 552(b), which "are explicitly made exclusive and must be narrowly construed." *Milner v. U.S. Dep't of Navy*, 562 U.S. 562, 565 (2011) (internal quotation marks and citation omitted); *see Murphy v. Exec. Office for U.S. Attys.*, 789 F.3d 204, 206 (D.C. Cir. 2015); *Citizens for*

6

*Responsibility & Ethics in Wash. v. U.S. Dep't of Justice* ("*CREW*"), 746 F.3d 1082, 1087–88

(D.C. Cir. 2014); *Pub. Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865, 869 (D.C. Cir.

2010). "[T]hese limited exemptions do not obscure the basic policy that disclosure, not secrecy,

is the dominant objective of the Act." *Rose*, 425 U.S. at 361.

The agency invoking an exemption has the burden "to establish that the requested

information is exempt." *Fed. Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill*, 443 U.S. 340,

352 (1979); *see U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749,

755 (1989); *DiBacco*, 795 F.3d at 195; *CREW*, 746 F.3d at 1088; *Elec. Frontier Found. v. U.S.*

*Dep't of Justice*, 739 F.3d 1, 7 (D.C. Cir. 2014), *cert. denied sub nom. Elec. Frontier Found. v.*

*U.S. Dep't of Justice*, 135 S. Ct. 356 (2014); *Assassination Archives & Research Ctr. v. CIA*, 334

F.3d 55, 57 (D.C. Cir. 2003). In order to carry this burden, an agency must submit sufficiently

detailed affidavits or declarations, a *Vaughn* index of the withheld documents, *see Vaughn v.*

*Rosen*, 484 F.2d 820, 827–28 (D.C. Cir. 1973), or both, to demonstrate that the government has

analyzed carefully any material withheld, to enable the court to fulfill its duty of ruling on the

applicability of the exemption, and to enable the adversarial system to operate by giving the

requester as much information as possible, on the basis of which the requester's case may be

presented to the trial court. *See Oglesby v. U.S. Dep't of Army*, 79 F.3d 1172, 1176 (D.C. Cir.

1996) ("The description and explanation the agency offers should reveal as much detail as

possible as to the nature of the document, without actually disclosing information that deserves

protection . . . [which] serves the purpose of providing the requestor with a realistic opportunity

to challenge the agency's decision." (citation omitted)); *see also CREW*, 746 F.3d at 1088 ("The

agency may carry that burden by submitting affidavits that 'describe the justifications for

nondisclosure with reasonably specific detail, demonstrate that the information withheld

logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" (quoting *Larson v. U.S. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009))). While "an agency's task is not herculean," *Murphy*, 789 F.3d at 209, it must "'describe the justifications for nondisclosure with reasonably specific detail' and 'demonstrate that the information withheld logically falls within the claimed exemption.'" *Id.* (quoting *Larson*, 565 F.3d at 862).

The FOIA provides federal courts with the power to "enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant," 5 U.S.C. § 552(a)(4)(B), and "directs district courts to determine *de novo* whether non-disclosure was permissible," *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.,* 777 F.3d 518, 522 (D.C. Cir. 2015). A district court must review the *Vaughn* index and any supporting declarations "to verify the validity of each claimed exemption." *Summers v. Dep't of Justice*, 140 F.3d 1077, 1080 (D.C. Cir. 1998). "In FOIA cases, 'summary judgment may be granted on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.'" *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013) (quoting *Consumer Fed'n of Am. v. U.S. Dep't of Agric.*, 455 F.3d 283, 287 (D.C. Cir. 2006)). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 715 F.3d 937, 941 (D.C. Cir. 2013) (quoting *ACLU v. U.S. Dep't of Def.,* 628 F.3d 612, 619 (D.C. Cir. 2011)).

A district court also has an "affirmative duty" to consider whether the agency has produced all segregable, non-exempt information. *Elliott v. U.S. Dep't of Agric.*, 596 F.3d 842,

851 (D.C. Cir. 2010) (referring to court's "'affirmative duty to consider the segregability issue *sua sponte*'" (quoting *Morley v. CIA*, 508 F.3d 1108, 1123 (D.C. Cir. 2007))); *Stolt–Nielsen Transp. Grp. Ltd. v. United States,* 534 F.3d 728, 734 (D.C. Cir. 2008) ("'[B]efore approving the application of a FOIA exemption, the district court must make specific findings of segregability regarding the documents to be withheld.'" (quoting *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007))); *Trans–Pac. Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1028 (D.C. Cir. 1999) ("'[W]e believe that the District Court had an affirmative duty to consider the segregability issue *sua sponte* . . . even if the issue has not been specifically raised by the FOIA plaintiff."); *see also* 5 U.S.C. § 552(b) ("Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection.").

## III.    DISCUSSION

DOJ renews its motion for summary judgment on both remaining claims because "the FBI conducted thorough and adequate searches for responsive records subject to FOIA and withheld only information protected by . . . [FOIA and PA] exemptions." Def.'s Mem. Supp. Renewed Mot. Summ. J. ("Def.'s Mem.") at 9, ECF No. 25. The plaintiffs, on the other hand, challenge the adequacy of the FBI's responses to the 2012 and 2013 McClanahan Requests and the Crider Request, contending that: (1) the FBI "performed inadequate searches in all three requests;" (2) certain FOIA exemptions were improperly applied; (3) certain records were improperly excluded from the search; and (4) not all reasonably segregable material was released. Pls.' Opp'n Def.'s Renewed Mot. Summ J. ("Pls.' Opp'n") at 10, ECF No. 29.[3] Each of these grounds raised by the plaintiffs is addressed *seriatim* below.

---

[3]     Notably, the plaintiffs do not raise in opposition any challenge under the Privacy Act and, accordingly, this Memorandum Opinion limits the discussion to the plaintiffs' arguments under the FOIA.

### A.      Adequacy of the FBI's Search

#### 1.      *Legal Standards*

Upon receiving a FOIA request, federal agencies are "required to perform more than a perfunctory search" to identify potentially responsive records. *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 514 (D.C. Cir. 2011). Instead, the agency bears the burden of demonstrating that it "made a 'good faith effort to conduct a search using methods which can be reasonably expected to produce the information requested.'" *DiBacco*, 795 F.3d at 188 (internal alterations omitted) (quoting *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)). To meet this burden, the agency must "demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'" *Valencia–Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (quoting *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990)).

At the summary judgment stage, this burden may be satisfied through submission of a "'reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched.'" *Ancient Coin Collectors Guild*, 641 F.3d at 514 (quoting *Valencia–Lucena*, 180 F.3d at 326). Such an affidavit must "'explain in reasonable detail the scope and method of the search conducted by the agency.'" *Morley*, 508 F.3d at 1121 (quoting *Perry v. Block,* 684 F.2d 121, 127 (D.C. Cir. 1982)). "Agency affidavits—so long as they are 'relatively detailed and non-conclusory'—are 'accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents.'" *Mobley v. CIA*, 806 F.3d 568, 581 (D.C. Cir. 2015) (quoting *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991)); *see also DeBrew v. Atwood*, 792 F.3d 118, 123 (D.C. Cir. 2015). Only where

"a review of the record raises substantial doubt, particularly in view of 'well defined requests and positive indications of overlooked materials,'" should summary judgment be denied. *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 314 (D.C. Cir. 2003) (quoting *Valencia–Lucena*, 180 F.3d at 326 (internal quotation marks omitted)).

### 2.    *Analysis*

The FBI has submitted seven declarations from the Section Chief of the Record/Information Dissemination Section ("RIDS") of the Records Management Division, detailing the scope and methodology of the searches undertaken in response to the plaintiffs' requests. *See* First Hardy Decl. ¶ 1; Notice of *Ex Parte*, *In Camera* Submission of Classified Decl. of David Hardy, ECF No. 13; Def.'s Reply Supp. First Mot., Ex. 1 ("Third Hardy Decl.") ¶ 1, ECF No. 20-1; Notice of Submission of *Ex Parte*, *In Camera* Decl. of David Hardy, ECF No. 21; Def.'s Mot., Ex. 1 ("Fifth Hardy Decl.") ¶ 1, ECF No. 25-1; Notice of *Ex Parte*, *In Camera* Filing, ECF No. 26; Def.'s Reply Supp. Renewed Mot. Summ. J. ("Def.'s Reply"), Ex. 1 ("Seventh Hardy Decl.") ¶ 1, ECF No. 32-1. The plaintiffs are critical of the searches for failing to search "*all* records systems which are reasonably likely to contain records," including the specific offices and email systems requested by the plaintiffs, Pls.' Opp'n at 11–12, and for using "improperly narrow search terms and [date] cut-offs," *id*. at 14. To understand properly these challenges to the adequacy of the searches conducted, the plaintiffs' FOIA requests are reviewed, followed by a description of the FBI's interpretation of those requests and efforts to locate responsive records.

### a.    *The Plaintiffs' Requests for Specific Location Searches*

The plaintiffs' three requests sought any and all records, including emails, subpoenas, and warrants, pertaining to Mr. McClanahan, his firm, any investigations involving his

possessing classified materials, and Ms. Crider. *See* First Hardy Decl. ¶¶ 5, 15 (quoting the 2012 McClanahan Request, 2013 McClanahan Request, and Crider Request). In addition to specifying the subject matter of the request, the plaintiffs identified the following locations for the FBI to search: the Central Records System ("CRS"); the Electronic Surveillance index ("ELSUR"); any shared drives, internal servers, and personal computers in the FBI Headquarters, the Washington Field Office, and the FBI components in Yemen and, in the case of Ms. Crider, the United Kingdom; any FBI email systems and personal email folders on personal computers used by FBI Headquarters, the Washington Field Office, and the FBI Components located in Yemen and, in the case of Ms. Crider, the United Kingdom; the National Security Branch; the Criminal, Cyber, Response, and Services Branch; the Information Technology Branch; the Office of the General Counsel; the Office of Integrity and Compliance; the Records Management Division; and the Security Division. *See* Compl. ¶¶ 89, 94, 102.

### b.    *The FBI's Interpretation of the Scope of the Requests and Efforts to Locate Responsive Records*

In response to these requests, the FBI primarily conducted searches within the CRS and the ELSUR, as specifically requested, using "a three way phonetic breakdown of the name Kelly Brian McClanahan, a three way phonetic breakdown of the name Cori Ana Crider, and a string search of 'National Security Counselors.'" First Hardy Decl. ¶¶ 33–34; Fifth Hardy Decl. ¶¶ 15–16. As explained in the declarations, the FBI's records are primarily maintained in the CRS, "an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by the FBI in the course of fulfilling its . . . functions as a law enforcement, counterterrorism, and intelligence agency." First Hardy Decl. ¶ 24.

The CRS includes records from "the entire FBI organization," including "records of FBI Headquarters ("FBIHQ"), FBI Field Offices, and FBI Legal Attaché Offices ("Legats") worldwide. *Id.* Separately, the ELSUR index is comprised of "records related to electronic surveillance, sought, administered, and/or conducted by the FBI since January 1, 1960." *Id.* ¶ 30. Since all pertinent records, including emails, should be captured in the CRS, "RIDS typically does not perform searches of e-mail systems," or individual FBI Field Offices and branches, except where there is a factual basis to conclude that "responsive material would exist outside the comprehensive CRS." *Id.* ¶¶ 35–36, 38; Fifth Hardy Decl. ¶¶ 17–18, 20. Here, because the plaintiffs referenced Mr. McClanahan's direct communications with Special Agent Belvin of the FBI's Washington Field Office and Alina Semo, the former Unit Chief of the FBI FOIA Litigation Unit in the Office of the General Counsel, the FBI performed additional searches of the email accounts of these two individuals as well as records maintained by the Washington Field Office. First Hardy Decl. ¶¶ 35–36; Fifth Hardy Decl. ¶¶ 17–18. As noted, the FBI ultimately processed 339 pages in response to the 2012 McClanahan Request, of which 76 pages were produced in full, 14 pages were withheld in part, and 24 pages were withheld in full as exempt, and 225 were withheld in full as duplicates, First Hardy Decl. ¶ 4; in response to the 2013 McClanahan request, the FBI processed 69 pages, of which 30 pages were produced in full, 13 pages were withheld in part, and 26 pages were withheld in full as exempt, Fifth Hardy Decl. ¶ 5; and, finally, in response to the Crider Request, the FBI processed 281 pages, of which 153 pages were produced in full, 101 pages were withheld in part, and 27 pages were withheld in full as exempt, First Hardy Decl. ¶ 4.

### c.      *The Scope of the FBI's Search Was Adequate*

The plaintiffs' contention that the FBI failed to search all record systems reasonably likely to contain responsive materials because it failed to search all of the systems specifically requested by the plaintiffs is unavailing.   "'[A]n agency's search obligations are not dictated by a requester's demands to search particular components or databases.'"  Def.'s Reply at 4 (quoting *Mobley v. CIA*, 924 F. Supp. 2d 24, 44 (D.D.C. 2013), *aff'd*, 806 F.3d 568, 582 (D.C. Cir. 2015)).   Indeed, as the D.C. Circuit recently opined, an agency is required only to search record systems that are reasonably likely to contain responsive records.  *Mobley*, 806 F.3d at 582.   Thus, the reasonableness of a search is not measured against the scope dictated by a requester's search instructions, particularly when those instruction do not provide "clear and certain" "lead[s]."  *Id.* Rather, "a search is generally adequate where the agency has sufficiently explained its search process and why the specified record systems are not reasonably likely to contain responsive records."  *Id.*

Here, the FBI described the CRS as consisting of "applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by the FBI," including emails, from the "entire FBI organization[,] encompass[ing] the records of FBI Headquarters[], FBI Field Offices, and FBI Legal Attaché Offices ("Legats") worldwide."  First Hardy Decl. ¶ 24.   The FBI further explained that because the plaintiffs have alleged that Mr. McClanahan corresponded with Special Agent Belvin of the Washington Field Office, and Ms. Semo, and was interviewed at the Washington Field Office, these leads were followed by conducting searches of the email accounts of these two individuals and "contact[ing] the FBI Washington Field Office to determine whether there was any additional information responsive to plaintiff McClanahan's request that had not be[en] captured by the other searches."  *Id.*  Through these targeted searches,

the FBI located an additional 90 pages, all found within the email accounts. First Hardy Decl. ¶ 35; Fifth Hardy Decl. ¶ 17.

Other than these targeted searches, the FBI explained that no other systems or locations requested by the plaintiffs are reasonably likely to contain additional responsive records. For example, "[a]ll of the offices that plaintiffs identified" in their requests, including the FBI Headquarters and FBI Legal Attaché Offices covering Yemen and the United Kingdom, "maintain and index their files in the CRS."[4] Seventh Hardy Decl. ¶ 5. Since Special Agent Belvin and Ms. Semo were the main points of contact with Mr. McClanahan, the FBI "concluded that searches of the accounts of other individuals, including those merely copied on e-mail messages or those who did not have the lead in responding to and resolving issues about [Mr. McClanahan's] possession of classified information was not reasonably calculated to locate additional responsive records." *Id.* ¶ 5 n.3.

The plaintiffs suggest that the FBI searched only the systems "most likely" to find records, rather than all systems reasonably likely to find responsive records. *See* Pls.' Opp'n at 12–13. Putting aside the semantic distinction the plaintiffs seek to draw between "most likely" and "reasonably likely," the plaintiffs have "offered no basis on which this court could conclude the presumption of good faith has been overcome." *Mobley*, 806 F.3d at 582. The FBI concedes that the CRS is not the only records system within the FBI, but only the "primary" records system. First Hardy Decl. ¶ 38. Where a factual basis is present to conclude that "responsive material would exist [in other systems of records] outside the comprehensive CRS," the FBI

---

[4]      To the extent the plaintiffs argue that the FBI was remiss not to search the FBI field office in Yemen, *see* Pls.' Opp'n at 15 n.10, the FBI explained that no field office is maintained in Yemen, Seventh Hardy Decl. ¶ 5 n.2. Instead, the FBI maintains a Legal Attaché office covering Yemen and that office maintains its files in the CRS. *Id.* ¶ 5. Consequently, a search of the CRS would reasonably have captured documents generated by that particular office.

would search those systems. *See id.* ¶¶ 35–38; Fifth Hardy Decl. ¶¶ 17–20. Indeed, in this case, the FBI searched additional systems of records beyond the CRS after concluding that "responsive e-mail records could reasonably exist as Plaintiff McClanahan cited in his request that he had direct communications with [two] identified FBI personnel," and, thus, additional records may be maintained at the Washington Field Office, to which office Special Agent Belvin was assigned and where Mr. McClanahan was interviewed. First Hardy Decl. ¶¶ 35–36; Fifth Hardy Decl. ¶ 17–18.

Far from undermining the reasonableness of its searches, as posited by the plaintiffs, Pls.' Opp'n at 13, the FBI's additional searches only underscore the fact that the FBI reasonably set the scope of the search and pursued "clear and certain" leads. *Mobley*, 806 F.3d at 582. The plaintiffs' requests for searches of other specific record systems were "mere fiat," without explanation as to why those specified record systems would reasonably contain responsive records.[5] *Id.*; *see generally* First Hardy Decl. ¶¶ 5, 15. By contrast, the FBI's explanations for determining that other record systems were not reasonably likely to contain additional responsive records are highly plausible. Consequently, the Court finds that the FBI's searches of the CRS, the EUSLR, the two targeted email accounts, and the Washington Field Office were reasonably adequate.[6]

---

[5] The plaintiffs speculate that other FBI employees' email accounts may contain additional responsive records because "transitory records" may not have been copied into CRS and emails exempt as attorney-client privileged reflect communications between "FBI attorneys and Special Agents or FBI paralegals . . . and DOJ attorneys," thereby suggesting that other people may also have emails pertaining to the plaintiffs. Pls.' Opp'n at 14. Even if the plaintiffs were correct that additional records may be located somewhere on an FBI system, without a more clear and certain lead, the FBI is not required to search every single record system in the hope that something additional may turn up. As the D.C. Circuit reiterated, "the FBI's search, under FOIA, 'is not unreasonable simply because it fails to produce all relevant material . . . .'" *Mobley*, 806 F.3d at 583 (quoting *Meeropol v. Meese*, 790 F.2d 942, 952–53 (D.C. Cir. 1986)).

[6] The Court declines the plaintiffs' invitation to "be reluctant to follow" the D.C. Circuit's binding holding in *Mobley*, Pls.' Opp'n at 13 n.7, that "[a]lthough an agency may not ignore a request to search specific record systems when a request reaches the agency before it has completed its search, a search is generally adequate where the agency has sufficiently explained its search process and why the specified record systems are not reasonably likely to contain responsive records," *Mobley*, 806 F.3d at 583. The plaintiffs criticize this holding as "unclear" and

### d.    *The Search Terms and Date Cut-offs Used Were Adequate*

The plaintiffs also challenge the adequacy of the terms and the cut-off date used by the FBI in conducting the search for responsive records. These critiques of the searches are unavailing.

### i.    *Adequacy of the Search Terms*

The plaintiffs contend that because the 2012 and 2013 McClanahan Requests sought "[a]ny and all records . . . pertaining to [Mr. McClanahan], National Security Counselors, any case numbers assigned to [investigations conducted by the FBI pertaining to Mr. McClanahan's possession of classified information, in the context of the *NSC* and *Mobley* FOIA cases], or any of the classified information [Mr. McClanahan] possessed," the FBI unreasonably limited the search to only the names of Mr. McClanahan and his firm, National Security Counselors. Pls.' Opp'n at 14. In support, the plaintiffs point out that, even though the "FBI and DOJ representatives repeatedly informed McClanahan and this Court in [the *NSC* and *Mobley* FOIA cases] that: 1) FBI was coordinating with CIA in the former case; and 2) FBI had investigated how McClanahan obtained the classified documents in the latter case," "[the] FBI processed *no* records documenting *any* correspondence with CIA" and no records documenting "*any* attempt to determine how McClanahan obtained the classified FBI document beyond records of interview *with McClanahan* and internal records which pertain to litigation strategy." *Id.* at 15 (emphasis in original) (internal quotation marks omitted). According to the plaintiffs, this lack of records "is especially strange in light of the fact that FBI's declarant Dennis Argall asserted

---

"confusing," Pls.' Opp'n at 13 n.7, but the Court disagrees. On the contrary, the D.C. Circuit has made clear that an agency may not categorically ignore a plaintiff's request to search specific record systems, but, if it adequately explains why the requested record systems are not reasonably likely to contain responsive records, then the agency's search may be adequate even if the requested record systems are not searched. The FBI has done that here.

Case 1:14-cv-00483-BAH   Document 34   Filed 09/01/16   Page 18 of 35

under oath to this Court that FBI had found no evidence supporting McClanahan's claim that the [classified FBI interview report obtained by Mr. McClanahan] was officially released." *Id.*

In response, the FBI justifies the search terms used because the "requests were for records about any investigation of [Mr. McClanahan] or NSC in a particular context—the possession of classified information" and, consequently, the use of the names of the requester and his firm as search terms would "cast[] the widest net for responsive records." Seventh Hardy Decl. ¶ 7. The logic underlying the use of these search terms appears sound.

Moreover, to the extent that the plaintiffs seek to cast doubt on the good faith presumption accorded to an agency's declarations by characterizing them as "inherently unbelievable" because more records were not located, Pls.' Opp'n at 15 (quoting *Weisberg v. Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983)), this effort falls short. For example, even if the FBI "coordinat[ed] with the CIA" regarding how Mr. McClanahan came to possess classified material, this does not compel the conclusion that such coordination resulted in the generation of records subject to disclosure under the FOIA. Any such coordination may been conducted over the telephone. In any event, the FBI's search did locate records regarding "attempt[s] to determine how McClanahan obtained the classified FBI document," since the plaintiffs concede that the FBI processed "records of interview *with McClanahan* and [other] internal records." Pls.' Opp'n at 15. The plaintiffs do not make clear what other "attempt[s]" would be required to determine how Mr. McClanahan obtained classified material other than interviewing Mr. McClanahan himself, and the Court declines to engage in such speculation.[7]

---

[7]      Along these lines, despite the plaintiffs' urging, the Court declines to find any dissonance between an FBI declarant asserting that "FBI had found no evidence supporting McClanahan's claim that the [classified FBI interview report obtained by Mr. McClanahan] was officially released" and the fact that no records were generated documenting this inquiry. *Id.* After all, Mr. Argall's declaration explained that he came to the conclusion that the classified record was not officially released by examining the FBI dissemination control markings on that document. In other words, no additional written record needs to have been generated by the making of that simple observation. *See* Def.'s Reply at 10 n.7.

The D.C. Circuit has repeatedly stated that the presumption of good faith "cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *Mobley*, 806 F.3d at 581 (quoting *Safecard Servs.*, 926 F.2d at 1200)); *DiBacco*, 795 F.3d at 191 (quoting *Wilbur*, 355 F.3d at 678); *Marcusse v. U.S. Dep't of Justice Office of Info. & Privacy*, Nos. 14-5073, 14-5099, 14-5100, 2015 WL 1606930, at *1 (D.C. Cir. Mar. 24, 2015). Here, the plaintiffs have not made an adequate showing, beyond mere speculation about potential undiscovered documents, to rebut the good faith presumption awarded to the FBI's declarations.

### ii.    *Reasonableness of the Search Cut-off Date*

The plaintiffs next argue that the FBI "wrongly imposed a cut-off date for [the 2013 McClanahan Request] corresponding to the date it performed the *first* search, [on November 1, 2013], even though it performed *additional* searches sometime between August-October 2015." Pls.' Opp'n at 16 (emphasis in original). The FBI's use of the date of the first search in response to the plaintiffs' request as the search cut-off date for any subsequent searches is subject to the "same standard of reasonableness that . . . applie[s] to test the thoroughness and comprehensiveness of agency search procedures." *McGehee v. CIA*, 697 F.2d 1095, 1101 (D.C. Cir. 1983). While the D.C. Circuit has rejected the "use of a time-of-request cut-off [as] *always* reasonable," *Pub. Citizen v. Dep't of State*, 276 F.3d 634, 642 (D.C. Cir. 2002) (emphasis in original), the use of a date-of-search cut-off has nonetheless been implicitly sanctioned, *id.* at 643 ("[A]t minimum, the CIA could use as the cut-off date the date on which the Information and Privacy Division determined which components to 'task.'" (quoting *McGehee*, 697 F.2d at 1104)). Relying on this guidance from the Circuit, a date-of-search cut-off has routinely been found to be reasonable, even if the agency performed subsequent searches. *See Nat'l Sec.*

*Counselors v. CIA*, 960 F. Supp. 2d 101, 153 (D.D.C. 2013) (citing *Pub. Citizen*, 275 F.3d at 644, for the proposition that the D.C. Circuit "implicitly approv[ed] as reasonable a 'date-of-search cut-off [date]'" (second alteration in original)); *ACLU v. U.S. Dep't of Homeland Sec.*, 738 F. Supp. 2d 93, 105 (D.D.C. 2010) ("[I]t was appropriate to require 'a date-of-search cut off [date].'" (quoting *Pub. Citizen*, 276 F.3d at 643)); *Schoenman v. FBI*, 573 F. Supp. 2d 119, 140 (D.D.C. 2008) (finding no "infirmity in the State Department's current date-of-search cut-off policy"); *Edmonds Inst. v. U.S. Dep't of Interior*, 383 F. Supp. 2d 105, 111 (D.D.C. 2005) ("The D.C. Circuit has all but endorsed the use of date-of-search as the cut-off date for FOIA requests. *See Public Citizen v. Dep't of State,* 276 F.3d 634, 642 (D.C. Cir. 2002) . . . . Under the date-of-search approach, Edmonds can, with relative ease, file a second FOIA request for documents created since December 31, 2002."). Under the weight of this authority resting on *Public Citizen*, this Court, too, finds that a date-of-search cut-off date is reasonable, even if subsequent searches are conducted, to avoid "an endless cycle of judicially mandated reprocessing." *Bonner v. U.S. Dep't of State*, 928 F.2d 1148, 1152 (D.C. Cir. 1991).

Accordingly, the Court concludes that the FBI has satisfactorily detailed its searches for responsive records and decisions made regarding the plaintiffs' specific search requests, and that the searches conducted were adequate.

## B.      The FBI Properly Applied FOIA Exemptions

The plaintiffs challenge the FBI's withholding of certain records, either in full or in part, under FOIA Exemptions 1, 3, 5 and 7(E).[8] Pls.' Opp'n at 17. To meet its burden of establishing

---

[8]      The FBI also withheld certain information under Exemption 6, 7(C) and 7(D), but the plaintiffs do not challenge those withholdings and instead limits their opposition to the withholdings under Exemptions 1, 3, 5, and 7(E). *See, e.g.*, Pls.' Opp'n at 24 ("[T]he Court should find that a genuine issue of material fact exists with respect to FBI's withholdings under FOIA Exemptions (b)(1), (b)(3), (b)(5), and (b)(7)(E) and deny summary judgment accordingly."). While the plaintiffs, in a footnote, invite consideration of "the ramifications of allowing [the] FBI to categorically withhold *every* name in *every* record," under Exemptions 6 and 7(C), *id.* at n.19, the Court declines to construe this invitation as an objection to the FBI's reliance on these exemptions. Even if this footnoted invitation

that the requested information was properly withheld under the asserted exemption, *Elec. Frontier Found.*, 739 F.3d at 7, the FBI must show that the proffered justification for invoking the relevant FOIA exemption is "'logical' or 'plausible,'" *Judicial Watch*, 715 F.3d at 941 (quoting *ACLU*, 628 F.3d at 619). As detailed below, the FBI has provided sufficient and plausible explanations for application of each contested exemption.

### 1.     FOIA Exemption 3

FOIA Exemption 3 applies to matters "specifically exempted from disclosure by statute . . . if that statute" either (1) "requires that the matters to be withheld from the public in such a manner as to leave no discretion on the issue," or (2) "establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3). The

---

amounted to an objection, which it does not, it would fail. Withholding the names and identifying information of FBI Special Agents, support personnel, third parties, and non-FBI governmental personnel, including DOJ attorneys, is proper under Exemptions 6 and 7(C), both of which shield personal identifying information from disclosure, when disclosure "would constitute a clearly unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(6), or would "constitute an unwarranted invasion of personal privacy," *id.* § 552(b)(7)(C). *See Judicial Watch*, 365 F.3d at 1125 (recognizing that "the privacy inquiry of Exemptions 6 and 7(C) [is] essentially the same," although Exemption 7(C) may be construed to provide broader protection). For both exemptions, the privacy interests of individuals mentioned in the records must be balanced against the public interest in disclosure, and the only public interest relevant to this inquiry is "the extent to which disclosure would serve the 'core purpose of the FOIA,' which is 'contribut[ing] significantly to public understanding of the *operations or activities of the government*.'" *U.S. Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487, 495 (1994) (emphasis and alteration in original) (quoting *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 775 (1989)). Here, the plaintiffs suggest that the FBI was remiss by "not perform[ing] *any* sort of meaningful or person-specific test to determine if the alleged invasion of these individuals' privacy is 'clearly unwarranted,'" particularly because certain individuals' identities are already publicly known, such as the DOJ attorneys of record. Pls.' Opp'n at 24 n.19. Yet, agencies are not required to conduct a person-specific test to withhold the names of individuals referenced in agency records under Exemptions 6 and 7(C), including the names of individuals. *See Reporters Comm.*, 489 U.S. at 762–63 (holding that rap sheets may be categorically withheld even though "events summarized in a rap sheet have been previously disclosed to the public"); *SafeCard*, 926 F.2d at 1206 ("We now hold categorically that, unless access to the names and addresses of private individuals appearing in files within the ambit of Exemption 7(C) is necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity, such information is exempt from disclosure."). Moreover, although the applicability of Exemptions 6 and 7(C) depends on a balancing test, the plaintiffs have articulated no precise public interest in the disclosure of these individuals' names that would "contribute significantly to public understanding of the operations or activities of the government." *Reporters Comm.*, 489 U.S. at 775. Instead, the plaintiffs make the conclusory statement: "these records *definitely* shed light on the operations and activities of the FBI or the federal government, and the suggestion that they do not is absurd." Pls.' Opp'n at 24 n.19 (emphasis in original) (quotation marks omitted). Strong words aside, the plaintiffs have expressed no basis upon which the Court could find that disclosure of the withheld names would contribute to the public's understanding of government operations or activities.

D.C. Circuit has explained that "'Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage.'" *Morley*, 508 F.3d at 1126 (quoting *Ass'n of Retired R.R. Workers v. U.S. R.R. Ret. Bd.*, 830 F.2d 331, 336 (D.C. Cir. 1987)). Here, the FBI invokes the coverage of Exemption 3 pursuant to the National Security Act of 1947, 50 U.S.C. § 102A(i)(l), as amended, 50 U.S.C. § 3024(i)(l).   Def.'s Mem. at 24.[9]

The National Security Act requires the Director of National Intelligence to "protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(i)(1). As interpreted by the D.C. Circuit, this language exempts from disclosure under FOIA, material that the agency "demonstrates . . . 'can reasonably be expected to lead to unauthorized disclosure'" of intelligence methods or sources. *Wolf*, 473 F.3d at 377 (quoting *Gardels v. CIA*, 689 F.2d 1100, 1103 (D.C. Cir. 1982)); *see also Larson*, 565 F.3d at 863 (allowing for withholding of information that "could provide enough clues to allow some individuals to determine who provided the information to the CIA").

As support for invocation of Exemption 3, the FBI submitted three supplemental sworn declarations *ex parte* and *in camera*. *See* Notice of *Ex Parte*, *In Camera* Submission of Classified Declaration of David Hardy, ECF No. 13; Notice of Submission of *Ex Parte*, *In*

---

[9]     DOJ labeled the pages processed in response to the 2012 McClanahan Request with the Bates numbers McClanahan-1 through McClanahan-339; the pages produced in response to the 2013 McClanahan Request were Bates numbered McClanahan2-1 through McClanahan2-69; and the pages produced in response to the Crider Request were Bates numbered Crider-1 through Crider-281. First Hardy Decl. ¶ 41; Fifth Hardy Decl. ¶ 23. Both Exemption 1 and 3 were asserted to withhold the same information on pages McClanahan 1–8, 312, 316, 318, 338, and 339; McClanahan2-1–5, 64, 66–69; and Crider 1–4. *See* First Hardy Decl. ¶¶ 44, 50 n.17; Fifth Hardy Decl. ¶¶ 26, 33 n.9. Since Exemption 3 was properly applied to this information, the applicability of Exemption 1 need not be addressed. *See Larson*, 565 F.3d at 862–63 (D.C. Cir. 2009) ("FOIA Exemptions 1 and 3 are independent; agencies may invoke the exemptions independently and courts may uphold agency action under one exemption without considering the applicability of the other.").

*Camera* Declaration of David Hardy, ECF No. 21; Notice of *Ex Parte*, *In Camera* filing, ECF No. 26. Due to the limited amount of publicly available information about the FBI's withholdings under Exemption 3, the plaintiffs "urge the Court to review this information *in camera* to ensure that it is in fact protectable intelligence sources and methods." [10] Pls.' Opp'n at 21. The Court is well cognizant that it "may examine the contents of . . . agency records *in camera* . . . ." 5 U.S.C. § 552(a)(4)(B). At the same time, "[w]hen an agency meets its burden through affidavits, '*in camera* review is neither necessary nor appropriate,' and '[*i*]*n camera* inspection is particularly a last resort in national security situations like this case.'" *Mobley*, 806 F.3d at 588 (emphasis and alteration in original) (quoting *Larson v. Dep't of State*, 565 F.3d 857, 870 (D.C. Cir. 2009)); *see also ACLU*, 628 F.3d at 626 ("*In camera* inspection is particularly a last resort in national security situations like this case—a court should not resort to it routinely on the theory that it can't hurt." (internal quotation marks omitted)); *Hayden*, 608 F.2d at 1387 ("[*I*]*n camera* review is a 'last resort' to be used only when the affidavits are insufficient for a responsible *de novo* decision." (quoting *Weissman v. CIA*, 565 F.2d 692, 697 (D.C. Cir. 1977))). "If the agency's affidavits provide specific information sufficient to place the documents within the exemption category, if this information is not contradicted in the record, and if there is no evidence in the record of agency bad faith, then summary judgment is appropriate without *in camera* review of the documents." *Mobley*, 806 F.3d at 588. The agency's declarations here meet this exacting standard.

---

[10]     The plaintiffs also "renew[their] objections to the introduction of the three *Ex Parte*, *In Camera* Hardy Declarations." Pls.' Opp'n at 21. Since the plaintiffs allege no new facts or law that would lead to reconsideration of the Court's decision to "accept[] the defendant's *in camera* filing as necessary to provide 'a sufficient basis for making a decision' in the instant matter," the plaintiffs' renewed objections are denied. *See* Minute Order, dated March 11, 2015 (quoting *Hayden v. NSA*, 608 F.2d 1381, 1384 (D.C. Cir. 1979)).

After reviewing the thorough *ex parte*, *in camera* declarations submitted in this case, the Court is satisfied that the records withheld by the FBI contain "intelligence methods and sources," which the National Security Act is designed to protect from unauthorized disclosure.

## 2.    FOIA Exemption 5

FOIA Exemption 5 applies to "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Two conditions must be met for a record to qualify for this exemption and be withheld: "[1] its source must be a Government agency, and [2] it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it." *Dep't of Interior v. Klamath Waters Users Protective Ass'n*, 532 U.S. 1, 8 (2001); *see also Nat'l Inst. of Military Justice v. U.S. Dep't of Def.*, 512 F.3d 677, 680 & n.4 (D.C. Cir. 2008). More specifically, Exemption 5 may be used to withhold records subject to "the deliberative-process privilege, the attorney-client privilege, and the attorney work-product privilege." *Nat'l Ass'n of Criminal Def. Lawyers v. U.S. Dep't of Justice Exec. Office for U.S. Attys. & U.S. Dep't of Justice*, No. 15-5051, 2016 WL 3902666, at * 1 (D.C. Cir. July 19, 2016) (citing *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 862 (D.C. Cir. 1980)).

The FBI avers that the information withheld under Exemption 5 "involved internal FBI discussions (between attorneys and/or attorneys and Special Agents or paralegals) and discussions between the FBI (attorneys and/or Special Agents) and DOJ attorneys about responding to this development in any pending or prospective litigation." [11] This identification of the interlocutors amply satisfies the first prong under Exemption 5. With respect to the

---

[11]    The FBI withheld information pursuant to Exemption 5 on the following pages: McClanahan-106–107, 115, 132–133, 141–142, 229, 237–241, 244–245, 246, 269–270, 280–285, 288, and 289; and McClanahan2-6–7, 8–9, 25–27, 28–29, 31–32, 48–49, 50–56, and 57–63, 65. Seventh Hardy Decl. ¶¶ 10–12.

second prong, the FBI invokes a combination of all three privileges. Def.'s Mem. at 25; *see also* First Hardy Decl. ¶ 57; Fifth Hardy Decl. ¶ 41. As discussed in more detail below, the withheld information contains protected work product, a conclusion which justifies withholding under Exemption 5 and obviates the need to address the FBI's alternative bases for withholding.[12]

"[T]he work product doctrine is 'an intensely practical one, grounded in the realities of litigation in our adversary system.'" *FTC v. Boehringer Ingelheim Pharm., Inc.*, 778 F.3d 142, 150 (D.C. Cir. 2015) (quoting *United States v. Nobles*, 422 U.S. 225, 238 (1975)). In applying the work product doctrine, the D.C. Circuit has instructed that it "should be interpreted broadly and held largely inviolate." *Judicial Watch v. U.S. Dep't of Justice*, 432 F.3d 366, 369 (D.C. Cir. 2005). A broad interpretation of the work product doctrine is consistent with the policy underpinnings articulated by the Supreme Court in the seminal case of *Hickman v. Taylor*, which discussed the importance of permitting "a lawyer [to] work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." 329 U.S. 495, 510 (1947).

The starting point for evaluating the scope of the work product doctrine is Federal Rule of Civil Procedure 26(b)(3), which protects "ordinarily," those "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative . . . ." Fed. R. Civ. P. 26(b)(3)(A). The attorney work product doctrine "'does not distinguish between factual and deliberative material'" but extends protection against disclosure to both types of material. *Judicial Watch*, 432 F.3d at 371 (quoting *Martin v. Office of Special Counsel*, 819 F.2d 1181, 1187 (D.C. Cir. 1987)). Both are protected because, in the context of

---

[12] Information on three pages—McClanahan 2-48, 49, and 65—was withheld pursuant to Exemption 5, under the deliberative process privilege, and Exemptions 6 and 7(C). *See* Fifth Hardy Decl. ¶¶ 40 n.11, 41 n.12; Seventh Hardy Decl. ¶¶ 10–12. As noted *supra* in note 8, the FBI correctly withheld this information under Exemptions 6 and 7(C). Consequently, the Court need not address whether the same information was properly withheld under the deliberative process privilege of Exemption 5.

work product, an attorney's discussion of factual matters may reveal his or her tactical or strategic thoughts. *See Boehringer*, 778 F.3d at 151 ("'At some point . . . a lawyer's factual selection reflects his focus; in deciding what to include and what to omit, the lawyer reveals his view of the case.'" (alteration in original) (quoting *Dir., Office of Thrift Supervision v. Vinson & Elkins, LLP*, 124 F.3d 1304, 1308 (D.C. Cir. 1997)); *Mervin v. FTC*, 591 F.2d 821, 826 (D.C. Cir. 1978) ("[E]ven the factual material segregated from attorney work-product is likely to reveal some of the attorney's tactical and strategic thoughts.").

Although both fact and opinion work product are protected, Rule 26 affords differing levels of protection. In the civil discovery context, the protection afforded to "fact" work product is qualified and may be overcome when the requesting party shows that the material sought is relevant and that "it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(i)–(ii). Opinion work product is given more absolute protection. Fed. R. Civ. P. 26(b)(3)(B) ("If the court orders discovery of those materials [for which a party has a substantial need], it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation."). The procedural distinction made between fact and opinion work product in civil discovery is "irrelevant" in the FOIA context, however. *FTC v. Grolier, Inc.*, 462 U.S. 19, 27 (1983). As the Supreme Court explained, "[i]t makes little difference whether a privilege is absolute or qualified in determining how it translates into a discrete category of documents that Congress intended to exempt from disclosure under Exemption 5. Whether its immunity from discovery is absolute or qualified, a protected document cannot be said to be subject to 'routine' disclosure." *Id.* Thus, "[a]ny part of [a document] prepared in anticipation of litigation, not just

the portions concerning opinions, legal theories, and the like, is protected by the work product doctrine and falls under exemption 5." *Tax Analysts v. IRS*, 117 F.3d 607, 620 (D.C. Cir. 1997). As a result, in the FOIA context, "[i]f a document is fully protected as work product, then segregability is not required." *Judicial Watch*, 432 F.3d at 371 ("[W]e hold that, because the emails at issue in this case are attorney work product, the entire contents of these documents— *i.e.*, facts, law, opinions, and analysis—are exempt from disclosure under FOIA.").

Despite its seeming breadth, particularly as applied under Exemption 5, the work product doctrine contains important limits. Courts have "uniformly . . . held [the work product doctrine] to be limited to documents prepared in contemplation of litigation." *Coastal States*, 617 F.2d at 864. When assessing whether a document is prepared "in anticipation of litigation," courts in this Circuit employ "a 'because of' test, inquiring 'whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.'" *Boehringer*, 778 F.3d at 149 (quoting *United States v. Deloitte LLP*, 610 F.3d 129, 137 (D.C. Cir. 2010)); *see also In re Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1998) ("The 'testing question' for the work-product privilege . . . is 'whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.'" (quoting *Senate of P.R. v. U.S. Dep't of Justice*, 823 F.2d 574, 586 n.42 (D.C. Cir. 1987))). "Where a document would have been created 'in substantially similar form' regardless of the litigation, work product protection is not available." *Boehringer*, 778 F.3d at 149.

Here, the FBI avers that information withheld under Exemption 5 belongs to four categories of email communications: (1) litigation preparation emails; (2) litigation

communication emails; (3) inter-agency litigation and case consultation emails; and (4) intra-agency case consultation emails. *See* First Hardy Decl. ¶ 57; Fifth Hardy Decl. ¶ 41. For each category of emails, the FBI avers that the communications were between "DOJ litigation counsel and FBI agency counsels," "between FBI agency counsels," between "FBI agency counsel and Special Agents," "between DOJ attorneys and an assisting FBI Special Agent," or between "FBI agency counsel and an FBI paralegal," and the communications were drafted by attorneys, "by Special Agents who were assisting the agency counsels," or "by a Special Agent at the direction of agency counsel," discussing "facts, legal analysis, legal strategy, legal advice,[] opinions," and/or case preparation considerations, during the pendency of the *NSC* and *Mobley* FOIA cases implicated in this case. First Hardy Decl. ¶ 57; Seventh Hardy Decl. ¶ 10. Therefore, since these withheld records are "documents . . . that are prepared in anticipation of litigation or for trial by . . . [a] party or its representative," Fed. R. Civ. P. 26(3)(A), these records are properly withheld under Exemption 5.

The plaintiffs' challenge to the information withheld under this exemption rests mainly on the segregability issue. The plaintiffs admit that "*some* of the withheld information is undoubtedly properly withheld," but protest that they "cannot begin to determine which parts are legitimate and which parts are mere puffery." Pls.' Opp'n at 21 (emphasis in original). As explained above, the FBI has provided sufficient detail for the Court to conclude that the few pages of communications withheld are subject to the work-product privilege. The plaintiffs' own use of "talismanic buzzwords" in their brief, *id.*, does not "'call[] into question by contradictory evidence in the record or by evidence of agency bad faith,'" *Judicial Watch*, 726 F.3d at 215 (quoting *Consumer Fed'n of Am.*, 455 F.3d at 287). That agency attorneys would discuss and share, among themselves and with FBI agents, factual developments, legal opinions and theories

crucial to the legal defense in connection with the *Mobley* and *NSC* FOIA cases is both logical and plausible.  Furthermore, as the D.C. Circuit has explained, once "a document is fully protected as work product, [] segregability is not required."  *Judicial Watch*, 432 F.3d at 371; *see also Rojas–Vega v. U.S. Citizenship & Immigration Servs.*, No. 15-5292, 2016 WL 3544989, at *1 (D.C. Cir. June 10, 2016) (citing *Judicial Watch*, 432 F.3d at 371) (per curiam)); *Martin v. Dep't of Justice*, 488 F.3d 446, 455–56 (D.C. Cir. 2007) (citing same); *cf. Nat'l Ass'n of Criminal Def. Lawyers*, 2016 WL 3902666, at *7 (stating that "an agency need not segregate and disclose non-exempt material if a record is 'fully protected' as work product," but that "[i]n cases involving voluminous or lengthy work-product records—the Blue Book is more than 500 pages in length—we think it generally preferable for courts to make at least a preliminary assessment of the feasibility of segregating nonexempt material").

Accordingly, the Court concludes, based upon the seven extensive declarations by the FBI, that information described as subject to Exemption 5 was properly withheld.

### 3.    FOIA Exemption 7(E)

Exemption 7(E) covers "records or information compiled for law enforcement purposes . . . that . . . would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).  The "requirement that disclosure risk circumvention of the law 'sets a relatively low bar for the agency to justify withholding.'"  *Pub. Emps. for Envtl. Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.–Mexico*, 740 F.3d 195, 204–05 (D.C. Cir. 2014) (quoting *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011)).  The agency "must demonstrate only that release of a document might increase the risk 'that a law will be violated or that past

violators will escape legal consequences.'" *Id.* at 205 (alterations in original) (internal quotation marks omitted) (quoting *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1193 (D.C. Cir. 2009)). "Rather than requiring a highly specific burden of showing how the law will be circumvented, exemption 7(E) only requires that the [agency] demonstrate logically how the release of the requested information might create a risk of circumvention of the law." *Blackwell*, 646 F.3d at 42 (quoting *Mayer Brown*, 562 F.3d at 1194 (internal quotation marks and alterations omitted)).

Here, the FBI avers that the pertinent records were "compiled and/or created in furtherance of the FBI's responsibilities of investigating the mishandling of classified national security information and of conducting national security background investigations of individuals to determine whether they are suitable to have access to classified national security information." First Hardy Decl. ¶ 59. Three groups of records were withheld under Exemption 7(E): (1) "database search results," *id.*; (2) references to "types and dates of investigations," *id.* ¶ 75; and (3) "internal non-public intranet web addresses of its database and webpages," *id.* ¶ 76.[13] The FBI further avers that the disclosure of such information would tend to reveal investigative techniques and procedures that could "enable criminals to employ countermeasures to avoid detection" and aid them in "circumvent[ing] the law." *Id.* ¶¶ 74–76.

The plaintiffs object on two grounds. First, with respect to the withheld database search results, the plaintiffs argue that the FBI failed to explain sufficiently that the non-public database is actually "unknown to the public." Pls.' Opp'n at 22. Contrary to the plaintiffs' position, the FBI has sufficiently averred that these search results were generated from "non-public databases," which are accessible only to "FBI personnel as well as task force members from local, state and other federal agencies." First Hardy Decl. ¶ 74. The FBI explains that "[n]on-

---

[13]     The FBI withheld McClanahan2-6, 8, 25, 28, 31, 48, 64 and Crider 65–77 under Exemption 7(E). First Hardy Decl. ¶ 74 n.28 (Crider) and Fifth Hardy Decl. ¶ 54 n.18 (McClanahan2).

federal members of FBI task forces are federally deputized while detailed to work on FBI task forces, and, thus, are considered Federal officers." Seventh Hardy Decl. ¶ 13. The plaintiffs' reasoning appears to be that because "an unknown number of persons, many of which are not part of the federal Government," can access the database, the showing "that the database is unique" and may be "considered 'non-public'" is insufficient "to warrant exemption." Pls.' Opp'n at 22–23. This reasoning is unpersuasive. Merely because deputized non-federal members of FBI task forces may be authorized to access a database does not somehow render the database public. The databases are plainly neither accessible nor known to the public at large.

Second, the plaintiffs contend that the FBI has not provided sufficient information for the Court to conclude "why the *exact* information withheld would allow wrongdoers to circumvent the law." *Id*. at 23. Contrary to the plaintiffs' bald allegation, the FBI has sufficiently explained how disclosure of the withheld information would allow wrongdoers to circumvent the law.[14] As the Circuit has explained, the bar for withholding under 7(E) is set low, and it permits withholding "not just for circumvention of the law, but for a risk of circumvention; not just for an actual or certain risk of circumvention, but for an expected risk; not just for an undeniably or universally expected risk, but for a reasonably expected risk; and not just for certitude of a reasonably expected risk, but for the chance of a reasonably expected risk." *Mayer Brown*, 562 F.3d at 1193. Here, the FBI explained that the information that can be gleaned from the first two

---

[14]     The parties argue whether Exemption 7(E) broadly permits the withholding of records containing information on "techniques and procedures for law enforcement investigations or prosecutions" or more narrowly permits withholding of only "techniques and procedures" the disclosure of which "could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 522(b)(7)(E); *see* Def.'s Mem. at 37; Pls.' Opp'n at 23; Def.'s Reply at 19. Although noting the different approaches adopted in other circuits, the D.C. Circuit "has applied the 'risk circumvention of the law' requirement both to records containing guidelines and to records containing techniques and procedures," *Pub. Emps. for Envtl. Responsibility*, 740 F.3d at 204 n.4 (citing *Blackwell*, 646 F.3d at 41–42), even though this sets the bar so low that in practice it is no different than a categorical withholding, *see id*. Under this binding precedent, the FBI has demonstrated that disclosure of the information withheld could "risk circumvention of the law."

categories of withheld materials—database research results and dates and types of investigations—could alert criminals as to the types of activities that the FBI monitors and would thereby "enable [these] criminals to employ countermeasures to avoid detection." First Hardy Decl. ¶¶ 74, 75. Furthermore, the disclosure of the third category of withheld information— "internal non-public intranet web addresses of its databases and webpages"—may allow individuals under investigation "to gain unauthorized access to, view and manipulate data on, or otherwise interfere with the FBI's non-public database accessible only via its internal intranet," which information may aid such individuals in "circumvent[ing] the law." *Id.* ¶ 76. These are all reasonably expected risks that can stem from the disclosure of the withheld information, and, consequently, the Court finds that the information was properly withheld under Exemption 7(E).

Accordingly, the FBI properly invoked Exemptions 3, 5 and 7(E) to withhold information from disclosure under the FOIA.

### C.    FOIA Exclusion under 5 U.S.C. § 552(c)

Section 552(c) of the FOIA permits agencies to "treat . . . records as not subject to the requirements" of the FOIA when, *inter alia*, a request involves access to "records or information compiled for law enforcement purposes" to the extent that such law enforcement records (1) "could reasonably be expected to interfere with enforcement proceedings," (2) "the investigation or proceeding involves a possible violation of criminal law," (3) "there is reason to believe" that "the subject of the investigation or proceeding is not aware of its pendency," and (4) "disclosure of the existence of the records could reasonably be expected to interfere with enforcement proceedings." *See* 5 U.S.C. §§ 552(b)(7)(A), 552(c)(1). Section 552(c) likewise permits agencies to "treat . . . records as not subject to the requirements" of the FOIA whenever someone requests "informant records maintained by a criminal law enforcement agency." *Id.*

§ 552(c)(2). Finally, § 552(c) permits the FBI to issue a *Glomar* response, in which is refuses "to confirm or deny the existence of any responsive records," *ACLU v. CIA*, 710 F.3d 422, 425 (D.C. Cir. 2013), to any request for records "pertaining to foreign intelligence or counterintelligence, or international terrorism" as long as "the existence of the records remains classified information." 5 U.S.C. § 552(c)(3).

Here, the plaintiffs have speculated that the FBI might be relying on the exclusion contained in § 552(c). *See* Pls.' Opp'n at 24; Def.'s Mem. at 22 ("In their Opposition [to the defendant's first motion to dismiss], Plaintiffs raise the issue of whether the FBI has relied upon 5 U.S.C. § 552(c) to exclude certain records in this case." (internal citations omitted)). Consequently, pursuant to the FBI's standard policies, the FBI has submitted *ex parte*, *in camera* declarations that "address the exclusion claim." *See* Def.'s Mem. at 41. The Court has conducted a full review of the claim and, if such an exclusion in fact were employed, it was and continues to remain, amply justified.

### D.    Segregability

Finally, the Court must consider whether the FBI has released reasonably segregable portions of responsive documents. "The FOIA requires that '[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt.'" *Morley*, 508 F.3d at 1123 (alteration in original) (citing 5 U.S.C. § 522(b)). To satisfy its segregability obligation, "[an] agency must provide a 'detailed justification' for its non-segregability," but "is not required to provide so much detail that the exempt material would be effectively disclosed." *Johnson v. Exec. Office for U.S. Attys.*, 310 F.3d 771, 776 (D.C. Cir. 2002) (citing *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 261 (D.C. 1977)). The agency may provide sufficient justification by describing the materials withheld, the

exemption under which they were withheld, and an affidavit attesting that "it released all segregable material." *See Loving v. Dep't of Def.*, 550 F.3d 32, 41 (D.C. Cir. 2008) (stating that "the description of the document set forth in the *Vaughn* index and the agency's declaration that it released all segregable material" are "sufficient for [the segregability] determination"); *Johnson*, 310 F.3d at 776.

The FBI has satisfied its segregability obligations here. The FBI has submitted no fewer than four public affidavits and three *ex parte, in camera* declarations describing the records at issue here, the materials withheld, and the exemptions pursuant to which they were withheld. *See generally* First Hardy Decl.; Third Hardy Decl.; Fifth Hardy Decl.; Seventh Hardy Decl. Furthermore, the FBI has attested that all reasonably segregable information has already been released and the remaining withheld information "would [either] trigger foreseeable harm to one or more interests protected by the cited FOIA exemptions . . . or . . . [is] so intertwined with such material that it could not be reasonably segregated for release." First Hardy Decl. ¶ 79; Fifth Hardy Decl. ¶ 55.

The plaintiffs, in opposition, have offered little other than conclusory statements that the FBI failed to reasonably segregate or that it failed to explain why some materials cannot be reasonably segregated. *See* Pls.' Opp'n at 23–25. As the D.C. Circuit has held, "[a]gencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material," which must be overcome by some "quantum of evidence" by the requester. *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007). The plaintiffs here do not support their accusations with the slightest quantum of evidence.

In sum, the FBI's search was adequate to locate all responsive documents, the exemptions invoked to withhold certain information were properly asserted, and all reasonably

segregable information has been released.  Accordingly, DOJ is entitled to summary judgment in its favor.

**IV.     CONCLUSION**

For the foregoing reasons, DOJ's renewed motion for summary judgment is granted.

An Order consistent with this Memorandum Opinion will issue contemporaneously.

Date: September 1, 2016

_____
BERYL A. HOWELL
Chief Judge